[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

————————————————

No. 15-11662

————————————————

D.C. Docket No. 1:13-cv-00084-WKW-PWG

WIREGRASS METAL TRADES COUNCIL AFL-CIO,

Plaintiff-Appellant,

versus

SHAW ENVIRONMENTAL & INFRASTRUCTURE, INC.,

Defendant-Appellee.

————————————————

Appeal from the United States District Court
for the Middle District of Alabama

————————————————

(September 8, 2016)

Before ED CARNES, Chief Judge, JORDAN, Circuit Judge, and SMITH,* District Judge.

ED CARNES, Chief Judge:

---

* Honorable C. Lynwood Smith, Jr., United States District Judge for the Northern District of Alabama, sitting by designation.

A dispute involving the interpretation of a collective bargaining agreement was submitted to an arbitrator, as both parties had agreed their disputes would be. As usually happens, the losing party was not happy with the loss. See Saturn Telecommunications Servs., Inc. v. Covad Communications Co., 560 F. Supp. 2d 1278, 1279 (S.D. Fla. 2008) (Jordan, J.) ("Everyone supposedly loves arbitration. At least until arbitration goes badly."). As too often happens, instead of accepting it and moving on, the loser moved the district court to set aside the arbitration award, which it did. Then the former winner, who had become a loser, appealed that decision to this Court. We reverse the district court's decision and restore the polarity of the parties to the status they were in when they left arbitration. We do so because of the law's insistence that arbitration losers who resort to the courts continue to lose in all but the most unusual circumstances, of which this is not one.

Shaw Environmental & Infrastructure, Inc., a government contractor on a military facility, suspended and later fired Jack Endicott, a union worker, for possessing government property without authorization. Endicott's union, Wiregrass Metal Trades Council AFL-CIO, filed a grievance challenging his termination. It contended, among other things, that Shaw lacked just cause to fire Endicott because he did not know that the property he possessed was government-owned. After the parties failed to resolve their dispute through the grievance process, the Union brought this action in federal court to compel arbitration under

2

its collective bargaining agreement with Shaw.  Several provisions of that agreement are involved in the dispute.

The collective bargaining agreement gives Shaw the right to discipline an employee for "just cause," and disciplinary guidelines in the agreement list types of conduct that "constitute just cause for disciplinary actions."  In relevant part, the guidelines prohibit employees from "[p]ossessing . . . Government property without proper authority."  That guideline — which we will call the "possession policy" — says nothing about whether a violation occurs if the employee does not know that the property he possesses is government-owned.  And for that offense, termination is listed as the only "Possible Level[ ] of Action By Employer."

With respect to arbitration, the agreement provides that "[t]he decision of the Arbitrator shall be final and binding upon both parties."  It gives the arbitrator "the authority to interpret and apply the provisions of this Agreement."  That authority is limited, however, by a "no-modification" clause, which states that "[t]he arbitrator shall not have the authority to change, alter, amend, modify, add to, or delete from this Agreement; such right is the sole prerogative of the contracting parties."  But see Bruno's, Inc. v. United Food & Commercial Workers Int'l Union, Local 1657, 858 F.2d 1529, 1532 n.4 (11th Cir. 1988) ("In this Court, 'no modification' clauses are not considered a reliable basis for overturning an arbitrator's interpretation of a collective bargaining agreement.").

3

The district court granted the Union's motion to compel arbitration and ordered the parties to select an arbitrator, which they did.  After holding a hearing, the arbitrator issued a written decision.  Siding with the Union, she found that Endicott did not violate Shaw's possession policy because he did not know that the property he possessed was government-owned.  As the award explained, "[Endicott] cannot be said to have violated a policy prohibiting possession of government property when he did not know the property belonged to the government or that it had been stolen."  For that reason, the arbitrator concluded that Shaw lacked just cause to fire Endicott and she awarded him back pay and benefits.

Shaw moved the district court to vacate the award, contending, among other things, that the arbitrator had exceeded her power by improperly modifying the collective bargaining agreement instead of interpreting it.[1]  Shaw argued that the

---

[1] The Supreme Court has recognized that the Labor Management Relations Act of 1947 (LMRA) provides an independent basis for federal jurisdiction over labor arbitration awards arising out of collective bargaining agreements, and that the LMRA empowers federal courts to fashion a body of federal common law standards for confirming and vacating labor arbitration awards.  Textile Workers Union v. Lincoln Mills of Ala., 353 U.S. 448, 450–52, 77 S. Ct. 912, 914–15 (1957); see also United Steel, Paper & Forestry, Rubber, Mfg., Energy, Allied Indus. & Serv. Workers Int'l Union AFL-CIO-CLC v. Wise Alloys, LLC, 642 F.3d 1344, 1352 (11th Cir. 2011) (explaining that the LMRA "governs suits to enforce or vacate an arbitration award arising out of a collective bargaining agreement").

But Shaw moved to vacate the arbitration award under the Federal Arbitration Act (FAA), 9 U.S.C. § 10(a), not the LMRA.  There is some ambiguity in our case law about whether the FAA applies to labor arbitration awards arising out of collective bargaining agreements. Compare Weeks v. Harden Mfg. Corp., 291 F.3d 1307, 1314 (11th Cir. 2002) ("[T]he FAA [is] applicable to all contracts of employment except those contracts involving transportation

4

arbitrator had modified the agreement by adding a <u>mens</u> <u>rea</u> or knowledge requirement to the possession policy, essentially changing "possessing government property" to "knowingly possessing government property."  Agreeing with Shaw, the district court concluded that "the arbitrator exceeded her authority when she added a knowledge requirement to the [collective bargaining agreement]'s delineation of offenses constituting just cause."  On that ground, the district court vacated the award.  The Union appealed the district court's judgment, which we review <u>de</u> <u>novo</u>.  <u>Davis v. Producers Agric. Ins. Co.</u>, 762 F.3d 1276, 1283 (11th Cir. 2014).

We begin our analysis by acknowledging that a court's review of an arbitrator's decision is limited.  <u>See</u> <u>United Steel, Paper & Forestry, Rubber, Mfg.,</u> <u>Energy, Allied Indus. & Serv. Workers Int'l Union AFL-CIO-CLC v. Wise Alloys,</u>

---

workers."), <u>with</u> <u>Wise Alloys</u>, 642 F.3d at 1353 n.4 (stating in dicta that "the FAA does not apply to collective bargaining agreements"); <u>see also</u> <u>Brisentine v. Stone & Webster Eng'g Corp.</u>, 117 F.3d 519, 525 (11th Cir. 1997) (acknowledging that "[n]either this Court nor the Supreme Court has decided whether collective bargaining agreements are subject to the FAA," and noting that other circuits had "reached conflicting results").

The LMRA clearly applies to labor cases.  Whether the FAA also applies does not matter in this case.  Shaw sought to vacate the arbitration award on the ground that the arbitrator exceeded her authority.  That is a recognized ground for vacatur under both the FAA and federal common law developed under the LMRA.  <u>See</u> 9 U.S.C. § 10(a)(4); <u>Wise Alloys</u>, 642 F.3d at 1352.  And even if the FAA does not apply to collective bargaining agreements, we may "look to the FAA for guidance when dealing with [labor] arbitration cases."  <u>Wise Alloys</u>, 642 F.3d at 1353 n.4.

LLC, 807 F.3d 1258, 1271 (11th Cir. 2015).  While a federal court may vacate an arbitration award when it "exceeds the scope of the arbitrator's authority," IMC-Agrico Co. v. Int'l Chem. Workers Council of the United Food & Commercial Workers Union, AFL-CIO, 171 F.3d 1322, 1325 (11th Cir. 1999), few awards are vacated because the scope of the arbitrator's authority is so broad, see Bakery, Confectionery & Tobacco Workers Local Union No. 362-T, AFL-CIO-CLC v. Brown & Williamson Corp., 971 F.2d 652, 655 (11th Cir. 1992).  In determining whether an arbitrator has exceeded her broad authority, two principles guide us.

The first is that we must defer entirely to the arbitrator's interpretation of the underlying contract no matter how wrong we think that interpretation is.  As the Supreme Court has explained:  "Because the parties bargained for the arbitrator's construction of their agreement, an arbitral decision even arguably construing or applying the contract must stand, regardless of a court's view of its (de)merits." Oxford Health Plans LLC v. Sutter, 569 U.S. ___, 133 S. Ct. 2064, 2068 (2013) (quotation marks omitted); see also United Paperworkers Int'l Union, AFL-CIO v. Misco, Inc., 484 U.S. 29, 38, 108 S. Ct. 364, 371 (1987).  That means "the sole question for us is whether the arbitrator (even arguably) interpreted the parties' contract, not whether [s]he got its meaning right or wrong." Sutter, 133 S. Ct. at 2068.  If we determine that "the arbitrator (even arguably) interpreted the parties'

6

contract," we "must end [our] inquiry and deny . . . a motion for vacatur." S. Commc'ns Servs., Inc. v. Thomas, 720 F.3d 1352, 1359 (11th Cir. 2013).

The second principle guiding our decision is that "an arbitrator 'may not ignore the plain language of the contract.'" Warrior & Gulf Nav. Co. v. United Steelworkers of Am., AFL-CIO-CLC, 996 F.2d 279, 281 (11th Cir. 1993) (quoting Misco, 484 U.S. at 38, 108 S. Ct. at 371). That means an arbitrator may not "issue[ ] an award that contradicts the express language of the agreement." IMC-Agrico Co., 171 F.3d at 1325; see also Bruno's, Inc., 858 F.2d at 1531. It also means that an arbitrator may not modify clear and unambiguous contract terms. See Houston Lighting & Power Co. v. Int'l Bhd. of Elec. Workers, Local Union No. 66, 71 F.3d 179, 184 (5th Cir. 1995) ("If the language of the agreement is clear and unequivocal, an arbitrator is not free to change its meaning."); Sears, Roebuck & Co. v. Teamsters Local Union No. 243, 683 F.2d 154, 155 (6th Cir. 1982) ("[A]n arbitrator may construe ambiguous contract language, but lacks authority to disregard or modify plain or unambiguous contract provisions.").

Those two principles define the scope of the arbitrator's authority. The arbitrator acts within her authority when she even arguably interprets a contract, and she exceeds her authority when she modifies the contract's clear and unambiguous terms. The outcome in this case depends on whether we characterize

7

the arbitrator's decision as an interpretation of the collective bargaining agreement or a modification of it.

To determine whether the arbitrator engaged in interpretation, as opposed to modification, we begin by looking at the relevant language in the collective bargaining agreement and asking, as a threshold matter, whether that language is open to interpretation. We have said that contract language is susceptible to an arbitrator's interpretation when it is "sufficiently ambiguous" on its face, Ierna v. Arthur Murray Int'l, Inc., 833 F.2d 1472, 1476 (11th Cir. 1987), or "[w]hen there are two plausible interpretations of an agreement," IMC-Agrico Co., 171 F.3d at 1328, which is pretty much the same thing.

A contract may be susceptible to interpretation when it is not facially ambiguous. As we have stated: "Even if we were to conclude that [a contract] is not ambiguous on its face, we would not be required to overturn [an arbitration] award." Int'l Bhd. of Elec. Workers, Local Union No. 199 v. United Tel. Co. of Fla., 738 F.2d 1564, 1568 (11th Cir. 1984). That is true because "collective-bargaining agreements may include implied, as well as express, terms," Consol. Rail Corp. v. Railway Labor Executives' Ass'n, 491 U.S. 299, 311, 109 S. Ct. 2477, 2485 (1989) (emphasis added), and an arbitrator is "empowered to discover [those] implied terms," In re Marine Pollution Serv., Inc., 857 F.2d 91, 96 (2d Cir. 1988); see also Ethyl Corp. v. United Steelworkers of Am., AFL-CIO-CLC, 768

8

F.2d 180, 186 (7th Cir. 1985) ("[T]he authority of an arbitrator to interpret a collective bargaining contract includes the power to discover [implied] terms."). The upshot is that "an arbitrator's award that appears contrary to the express terms of the agreement may nevertheless be valid if it is premised upon reliable evidence of the parties' intent." United Tel. Co. of Fla., 738 F.2d at 1568.

The possession policy identifies as a fireable offense "[p]ossessing . . . Government property without proper authority." While the parties agree that the policy says nothing about whether the offender must know that the property is government-owned when he possesses it, they disagree about the effect of that silence. Shaw contends that the policy's silence renders it unambiguous and impervious to interpretation. According to Shaw, the policy's failure to say anything about a knowledge requirement definitively shows that the parties did not intend any such requirement, but instead intended for the possession of government property without proper authority to be a strict liability offense. The Union, on the other hand, contends that the policy's silence renders it open to interpretation, allowing the arbitrator to read into it (or infer from it) a knowledge requirement.

The language of the possession policy certainly could have been clearer. It could have stated, for example, that possessing government property without proper authority is an offense "whether or not the employee knows that the

9

property belonged to the government at the time he possesses it." But it does not say that. The policy also could have said that "knowingly possessing government property without proper authority" is an offense. But it does not say that either. While Shaw argues that the Union could have bargained for an express knowledge requirement and failed to do so, it is equally true that Shaw could have bargained for language expressly excluding a knowledge requirement and failed to do so.

According to the Union, the failure of the policy language to state one way or the other whether knowledge that the property belonged to the government is required leaves the door open for an arbitrator to read a knowledge requirement into the policy language as an implied term. In support of its view, the Union points to decisions in which courts have read mental state requirements into criminal statutes that said nothing about them. See, e.g., Staples v. United States, 511 U.S. 600, 619, 114 S. Ct. 1793, 1804 (1994) (interpreting a criminal statute to include a requirement of intent and knowledge even though it was silent on those points). The district court rejected the analogy, stating: "While [the Union] argues that the arbitrator's adding of a knowledge requirement to the possession offense was merely an act of interpretation akin to the Supreme Court's interpretation of a [criminal statute], such an analogy is attenuated and fails to recognize the important differences between bargained for agreements and laws proscribing criminal behavior."

10

That is a good point, but the Union's point behind the analogy is (or should be) a different one.  The point is that when the Supreme Court reads a knowledge or intent requirement into a criminal statute, it is interpreting the statute, not modifying it.  We know that because courts do not have the authority to amend, modify, or revise statutes.  See Pavelic & LeFlore v. Marvel Entm't Grp., 493 U.S. 120, 126, 110 S. Ct. 456, 460 (1989) ("Our task is to apply the text, not to improve upon it."); Nguyen v. United States, 556 F.3d 1244, 1256 (11th Cir. 2009) ("We are not authorized to rewrite, revise, modify, or amend statutory language in the guise of interpreting it.").  If the Supreme Court engages in interpretation when it reads a knowledge or intent requirement into a criminal statute — and we must follow the official party line that it is interpreting the statute instead of amending it when it does that — then the arbitrator can be said to have engaged in interpretation when she read a knowledge requirement into the possession policy of the collective bargaining agreement.  Her interpretation may be wrong, but it is nonetheless an interpretation.  Or so goes the argument.

But an arbitrator's authority to discover implied terms is not boundless.  There are circumstances in which an arbitrator acts beyond her authority in "discovering" such terms.  She does so, for instance, when she imposes a remedy that the collective bargaining agreement does not allow.  See Butterkrust Bakeries v. Bakery, Confectionery & Tobacco Workers Int'l Union, AFL-CIO, Local No.

11

361, 726 F.2d 698, 700 (11th Cir. 1984).  In this case, for example, the collective bargaining agreement listed termination as the only possible disciplinary action for possessing government property without proper authority.  If the arbitrator found that Endicott had violated the possession policy but nonetheless ordered Shaw to reinstate him and impose a reprimand instead of termination, the arbitrator would have amended the agreement and exceeded the scope of her authority.

Having determined that the possession policy is at least open to interpretation, the next question is whether the arbitrator did interpret it.  In many cases, courts determine whether an arbitrator engaged in interpretation, as opposed to modification, by looking at the arbitrator's reasoning.  The reasoning might show that she engaged in a textual analysis of the relevant terms.  See Sutter, 133 S. Ct. at 2068–69; Thomas, 720 F.3d at 1358–60.  It might also show that she attempted to give meaning to express terms — or discover implied terms — based on extrinsic evidence of the parties' intent, such as their bargaining history or past practices.  See Loveless v. Eastern Air Lines, Inc., 681 F.2d 1272, 1279–80 (11th Cir. 1982); United Tel. Co. of Fla., 738 F.2d at 1569.  If the arbitrator's reasoning shows that she did either of those things, that will ordinarily mean she engaged in interpretation, not modification.

That approach works, however, only when the arbitrator provides a reasoned explanation for her award.  Arbitrators usually are not required to include

12

explanations, much less detailed ones, and they often do not. See Wise Alloys, LLC, 807 F.3d at 1275 ("Unless the parties stipulate otherwise . . . an arbitrator is under no obligation to provide explanations with h[er] award."); Cat Charter, LLC v. Schurtenberger, 646 F.3d 836, 844 (11th Cir. 2011) ("Generally, an arbitrator need not explain her decision; thus, in a typical arbitration where no specific form of award is requested, arbitrators may provide a 'standard award' and simply announce a result."). The problem that arises is what to do when an arbitrator's award fails to articulate a rationale from which we can infer whether she engaged in interpretation or instead in modification of the underlying agreement.

That problem exists in this case. In the written explanation accompanying her award, the arbitrator quoted the policy in the agreement prohibiting employees from possessing government property without proper authority, acknowledged the parties' disagreement about whether the policy required knowing possession, and then simply announced that Endicott had not violated the policy because he did not know that property he possessed was government-owned. While that shows the arbitrator ruled in favor of Shaw because of her finding that he did not knowingly possess the government property without authority, there is no indication that her imposition of the knowledge requirement resulted from interpretation of the agreement instead of her own view of right and wrong. She did not characterize her task as one of interpretation. She did not describe the plain meaning of the

13

terms in the policy.  She did not invoke canons of construction.  She did not look to extrinsic aids to find the parties' intent.  She did not explicitly do any of the things that we ordinarily associate with an interpretive effort.  But that does not mean that she failed to do some of them implicitly — in her head instead of on the page.

Given what we have and what we don't have from the arbitrator, one could fairly characterize her decision as an interpretation of the agreement or as a modification of it.  One characterization is as fair as the other.  So we are, like Buridan's ass, stuck between two equally plausible choices.  Did the arbitrator interpret the possession policy and discover an implied knowledge requirement, or did she impermissibly modify the policy by simply adding that requirement?

Unlike Buridan's ass, we need not starve for want of an answer because the Supreme Court provided one more than a half century ago.  In the Enterprise Wheel case a labor arbitrator had awarded wrongly fired employees reinstatement and back pay for a period of time that went beyond the expiration of the collective bargaining agreement.  United Steelworkers of Am. v. Enter. Wheel & Car Corp., 363 U.S. 593, 595, 80 S. Ct. 1358, 1360 (1960).  The arbitrator did not expressly "premise his award on his construction of the contract."  Id. at 598, 80 S. Ct. at 1361.  When the employer refused to comply with the award, the union brought a lawsuit in federal court to enforce it.  Id. at 595, 80 S. Ct. at 1360.  The court of appeals held that the award of back pay for a period that extended after the date of

14

termination of the collective bargaining agreement could not be enforced.  Id. at 596, 80 S. Ct. at 1360.

In reversing, the Supreme Court noted that the basis for the arbitrator's award was ambiguous.  Id. at 597, 80 S. Ct. at 1361.  On the one hand, the award could be read as based solely on the arbitrator's personal view "of the requirements of enacted legislation, which would mean that he exceeded the scope of the submission."  Id.  On the other hand, the award could also be read "as embodying a construction of the agreement itself," which would mean that he had not gone beyond his proper role "in determining the sense of the agreement."  Id. at 597–98, 80 S. Ct. at 1361.  Because it was "not apparent" that the arbitrator had exceeded his authority, the Court concluded that the award had to be enforced.  Id. at 598.  It held that:  "A mere ambiguity in the opinion accompanying an award, which permits the inference that the arbitrator may have exceeded his authority, is not a reason for refusing to enforce the award."  Id. at 598, 80 S. Ct. at 1361.  The policy behind the holding is that "[t]he refusal of courts to review the merits of an arbitration award is the proper approach to arbitration under collective bargaining agreements."  Id. at 596, 80 S.Ct. at 1360.  It is the proper approach because "[t]he federal policy of settling labor disputes by arbitration would be undermined if courts had the final say on the merits of the awards."  Id.

15

The rule of Enterprise Wheel is that, when it is "not apparent" from the arbitrator's stated reasoning (or lack thereof) whether she permissibly interpreted a collective bargaining agreement or impermissibly modified it, and one can plausibly read the award either way, the court must resolve the ambiguity by finding that the award is an interpretation of the contract and enforcing it. The rule reflects a strong, albeit not irrebuttable, presumption that the arbitrator has interpreted the agreement instead of modifying it. See Sullivan, Long & Hagerty, Inc. v. Local 559 Laborers' Int'l Union of N. Am., 980 F.2d 1424, 1426 (11th Cir. 1993) ("[A]rbitral awards enjoy a strong presumption of finality in the labor arena."). As the Seventh Circuit put it, "the reviewing court's function . . . is at an end when it concludes that what the arbitrator did was interpretation," and "when in doubt the court must find that it was interpretation." Ethyl Corp., 768 F.2d at 187.

The interpretation presumption is grounded in the policies underlying federal arbitration law and the consequences of too eagerly vacating awards. For one thing, if we were to vacate arbitration awards based on ambiguity in the arbitrator's reasoning, we would dissuade arbitrators from providing explanations for their awards. As the Supreme Court explained in Enterprise Wheel: "To require opinions free of ambiguity may lead arbitrators to play it safe by writing no supporting opinions. This would be undesirable for a well-reasoned opinion tends

16

to engender confidence in the integrity of the process and aids in clarifying the underlying agreement." 363 U.S. at 598, 80 S. Ct. at 1361 (footnote omitted).

This case exemplifies what the Supreme Court said in Enterprise Wheel. At oral argument, Shaw's counsel acknowledged that if the arbitrator had issued a standard award, simply announcing her result without explanation, there would be no grounds for vacating the award. We should not vacate award because the arbitrator provided an incomplete explanation for the award instead of none at all. We don't want to discourage arbitrators from saying anything beyond who won and how much.

Applying the presumption in favor of enforcing arbitration awards also promotes "[t]he federal policy of settling labor disputes by arbitration." Id. at 596, 80 S. Ct. at 1360; see also Wallace v. Civil Aeronautics Bd., 755 F.2d 861, 863–64 (11th Cir. 1985) ("Although such extreme deference has its costs in the particular case, those costs are far outweighed by the general benefits that accrue to the national labor scheme from giving arbitral awards a strong presumption of finality."). A readiness to vacate arbitration awards would undermine the purpose of arbitration, which is to reduce the number of disputes coming into the courts, and it "would make meaningless the provisions that the arbitrator's decision is final, for in reality it would almost never be final." Enterprise Wheel, 363 U.S. at 599, 80 S. Ct. at 1362.

We have lamented the fact that, all too often, parties "try[ ] to convert arbitration losses into court victories." B.L. Habert Int'l, LLC v. Hercules Steel Co., 441 F.3d 905, 913 (11th Cir. 2006), abrogated on other grounds by Frazier v. CitiFinancial Corp., 604 F.3d 1313 (11th Cir. 2010). Here is what we have said:

> When a party who loses an arbitration award assumes a never-say-die attitude and drags the dispute through the court system . . . , the promise of arbitration is broken. Arbitration's allure is dependent upon the arbitrator being the last decision maker in all but the most unusual cases. The more cases there are, like this one, in which the arbitrator is only the first stop along the way, the less arbitration there will be. If arbitration is to be a meaningful alternative to litigation, the parties must be able to trust that the arbitrator's decision will be honored sooner instead of later.

Id. The Enterprise Wheel presumption, which we apply today, helps keep the promise of arbitration. By presuming, in the absence of evidence to the contrary, that an arbitrator's award rested on an interpretation and not a modification of an agreement, we discourage parties from trying to snatch court victories from the jaws of arbitration defeats.

Viewed through the spokes of Enterprise Wheel and its presumption, the outcome in this case is clear to us. Because we must resolve the ambiguity in the stated reasons for the award in favor of enforcement, we conclude that the arbitrator interpreted instead of modified the agreement. Our inquiry is at an end, and the award must be upheld.

**REVERSED AND REMANDED.**

18